STATE OF CONNECTICUT *v.* CHRISTOPHER DOYLE
(AC 32411)

Gruendel, Beach and Robinson, Js.

Argued October 18—officially released November 27, 2012

*Kevin C. Connors*, with whom, on the brief, was *Mark C. Hauslaib*, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Edward R. Azzaro*, assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Christopher Doyle, appeals from the judgment of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a (a) (2). On appeal, the defendant contends that the trial court abused its discretion in denying his motions to suppress evidence of his blood test. He raises two distinct claims in that regard. First, the defendant argues that the court erroneously found that he consented to the blood test. Second, he maintains that the blood test resulted from an unconstitutional seizure. We disagree and, accordingly, affirm the judgment of the trial court.

Because the court in its oral decision denying the motions to suppress made limited factual findings, we "must look to all the evidence produced in support of its decision." (Internal quotation marks omitted.) *State v. Leonard*, 14 Conn. App. 134, 135, 539 A.2d 1030 (1988), aff'd, 210 Conn. 480, 556 A.2d 611 (1989). From the evidence adduced at the hearing on the motions to suppress, the court reasonably could have found the following relevant facts. In the late morning of August 17, 2007, the defendant was driving a minivan along North Windham Road on his way to a Wal-Mart store in South Windham. Donald Schaus was standing in his driveway at 42 North Windham Road as the defendant's vehicle approached traveling "pretty fast." The vehicle veered off the road and onto Schaus' property, where it

struck Schaus.[1] The impact of the collision immediately caused Schaus' body to flip into the air, striking the hood and windshield of the vehicle, which shattered. He then was thrown approximately fifteen feet from the vehicle into a stone wall. Due to the severity of the injuries he sustained—which included a broken neck, a shattered leg and a bleeding head wound—Schaus was transported by a Life Star helicopter to Harford Hospital for emergency treatment.[2]

Troopers Sean Mahar and Denise Sevigny of the state police arrived at the scene shortly thereafter. They spoke with the defendant, who stated that Schaus had entered the roadway prior to being struck. That representation contradicted the testimony of an eyewitness to the accident, Tina Hunting, who testified at the suppression hearing that Schaus remained on his property and never entered the roadway. The defendant further stated that he was not under the influence of any alcohol or drugs. At that time, both Mahar and Sevigny detected the odor of alcohol on his breath. When the defendant's supervisor from work arrived, he, too, smelled alcohol on the defendant's breath and shared that observation with Mahar. When asked about that odor, the defendant stated that he had consumed alcohol on a flight earlier that day until "one or two in the morning." As a result, Mahar had the defendant perform three field sobriety tests.[3] In light of the defendant's "standard" perfor-

---

[1] An eyewitness to the accident testified at the suppression hearing that the defendant did not make any attempt to avoid Schaus.

[2] A witness testified at the suppression hearing that a Life Star helicopter is "a flying ambulance that contains pilots as well as [emergency medical technicians] used to transport patients to various facilities throughout the state," most often "patients that are very seriously injured or [facing] the possibility of death or serious injury."

[3] The three field sobriety tests administered were the one leg stand test, the walk and turn test and the horizontal gaze nystagmus test. "The horizontal gaze nystagmus test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is

mance during the tests, Mahar concluded that probable cause was lacking to arrest the defendant at that time.[4]

Mahar then walked away from the defendant and conferred with his supervisor, Sergeant Joseph Mercer. As he did so, the defendant walked over to speak with his father, who had arrived at the scene. The defendant was neither placed under arrest nor advised of his *Miranda* rights.[5] Rather, the defendant moved freely about the accident scene without restraint or restriction by the police. At no time did the police handcuff the defendant, lock him in a cruiser or otherwise prevent him from leaving the scene. The police also did not impair the defendant's ability to talk with his father or use his cell phone. Mahar and Mercer testified at the suppression hearing that the defendant was free to leave the scene after passing the field sobriety tests.[6]

While conferring, Mahar and Mercer discussed requesting a blood sample from the defendant. At the

intoxicated the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." (Internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 770 n.3, 970 A.2d 108 (2009).

[4] Although the defendant performed the three field sobriety tests to "standard," he failed to perform one component of the walk and turn test properly. Mahar testified that the defendant made "an improper turn at the end of his first walking series prior to his second walking series." Mahar classified that improper turn as a "clue" to whether the defendant was under the influence of alcohol.

[5] In the seminal case of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that when a suspect is subjected to custodial interrogation, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id., 479. In the decades since, "*Miranda* has become embedded in routine police practice to the point where warnings have become part of our national culture." *Dickerson* v. *United States*, 530 U.S. 428, 443, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

[6] After completing the field sobriety tests, Mahar did not expressly inform the defendant that he was free to leave. At no point did the defendant inquire as to whether he could leave.

suppression hearing, Mahar testified that taking a blood sample is "standard operating procedure" in automobile accidents involving serious injury or death. Mercer likewise testified that "[f]or an accident similar to this, where it's reported to me as the scene supervisor, of the serious physical injury, as a normal course of business for our departmental policy we'll request that any and all involved operators consent to give an analysis of their blood." In light of the severe injuries sustained by Schaus, Mahar retrieved a standardized form from his cruiser entitled "Consent to Chemical Test."[7] He and Mercer then walked over to the defendant, who was standing with his father by a roadside guardrail, and asked him to submit to a blood test. They explained the consent form to him and gave him the opportunity to review the form.[8] The defendant then signed the form in the presence of Mahar, Mercer and his father without asking any questions.

Mercer then directed state police Trooper Harold N. French to transport the defendant to Windham Hospital. The defendant did not object and was not handcuffed or restrained during the drive. Upon arriving, French escorted the defendant into the hospital while carrying a blood collection kit he had retrieved from his cruiser. In addition to blood collection apparatus, the kit contained a form entitled "Request for Examination of Specimens for Alcohol/Drugs." Toward the bottom of

---

[7] The standardized consent form stated in relevant part: "Realizing that I have been involved in a motor vehicle accident in which death or serious injury has occurred, I am voluntarily offering to submit to a chemical test to analyze my blood . . . , I understand that this test is voluntary on my part and I am not obligated to take any such test. I also understand that a positive test result may be used against me in any criminal or civil action which may be undertaken as a result of this accident. My signature indicates that I understand the nature of this test and voluntarily consent to the taking and analysis of my blood . . . ."

[8] At the time of the accident, the defendant was twenty-four years old, literate and a student at Eastern Connecticut State University.

the form is a section entitled "Subject Consent to Official Request for Sample Collection (blood samples only)," which states that the subject gives "consent for the collection of blood samples, as indicated by my signature . . . ." The defendant signed that form in the presence of French and his mother, who had met them at the hospital. French testified at the suppression hearing that neither the defendant nor his mother asked any questions about the consent form or his consent to the blood sample. He further testified that he did not coerce the defendant in any manner or promise him anything in exchange for his consent. After a registered nurse took a sample of the defendant's blood, the defendant exited the hospital with his parents.

Subsequent testing of the defendant's blood at the state toxicology laboratory revealed an elevated blood alcohol level. By long form information[9] dated January 13, 2010, the state charged the defendant with one count of assault in the second degree with a motor vehicle in violation of General Statutes § 53a-60d, one count of assault in the third degree in violation of General Statutes § 53a-61 (a) (3), and one count of operating a motor vehicle while under the influence of intoxicating liquor in violation of § 14-227a (a) (2). The defendant thereafter file motions to suppress evidence of statements he made on the date of the accident, his consent to the blood test and the results thereof. Prior to the commencement of trial, the court held a suppression hearing over the course of two days, at which testimonial and documentary evidence was presented. Following the conclusion of the hearing, the court denied the defendant's motions to suppress, finding that the defendant had consented to the blood test and that he was not unconstitutionally seized at the accident scene.

[9] An information is "[a] formal criminal charge made by a prosecutor without a grand jury indictment." Black's Law Dictionary (9th Ed. 2009). Pursuant to Practice Book § 36-11, "[a]ll felonies [in Connecticut] shall be prosecuted by information. . . ."

A jury trial followed, and the defendant was found guilty of operating a motor vehicle while under the influence of intoxicating liquor. The defendant was acquitted of the remaining charges. The defendant then pleaded guilty under a part B information charging him with having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor or drugs.[10] The court sentenced him to a total effective term of two years incarceration, execution suspended after fifteen months, followed by three years probation. This appeal followed.

Before addressing the specific claims advanced by the defendant in this appeal, we note certain principles governing our analysis. "[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Boyd*, 295 Conn. 707, 717, 992 A.2d 1071 (2010), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011). With that standard in mind, we turn our attention to the defendant's claims.

---

[10] In pleading guilty, the defendant admitted that he previously had been convicted of operating a motor vehicle while under the influence of intoxicating liquor. During the court's canvass of his plea, the defendant acknowledged that the maximum penalty for this second offense was two years of imprisonment. See General Statutes § 14-227a (g) (2) (B).

I

We first address the defendant's contention that the court erroneously found that he consented to the blood test. The defendant argues that the totality of the circumstances establishes that his consent was not free and voluntary. We disagree.

Under both the fourth amendment to the federal constitution and article first, § 7, of our state constitution, a warrantless search is presumptively unreasonable.[11] *State* v. *Brunetti*, 279 Conn. 39, 69, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). At the same time, a search is not unreasonable when "a person with authority to do so has voluntarily consented to the search." (Internal quotation marks omitted.) Id.; see also *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) ("one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search [or seizure] that is conducted pursuant to consent"). The state bears the burden of proving, by a preponderance of the evidence; *State* v. *Jenkins*, 298 Conn. 209, 249 n.32, 3 A.3d 806 (2010); that "the consent was free and voluntary . . . . The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not

---

[11] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The fourth amendment is made applicable to the states by incorporation through the due process clause of the fourteenth amendment. *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

enough to meet the state's burden. . . . The question whether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied . . . is a question of fact to be determined from the totality of all the circumstances. . . . As a question of fact, it is normally to be decided by the trial court upon the evidence before that court together with the reasonable inferences to be drawn from that evidence. . . . We may reverse [the trial court's factual] findings on appeal only if they are clearly erroneous. . . . Thus, [w]hether there was valid consent to a search is a factual question that will not be lightly overturned on appeal." (Citation omitted; internal quotation marks omitted.) Id., 249–50.

Our review of the totality of the circumstances surrounding the defendant's consent to the blood test entails consideration of several factors, including "the youth of the accused . . . his lack of education . . . or his low intelligence . . . the lack of any advice to the accused of his constitutional rights . . . the length of detention . . . the repeated and prolonged nature of the questioning . . . and the use of physical punishment such as the deprivation of food or sleep . . . ." (Internal quotation marks omitted.) Id., 251. The defendant's mother testified at the suppression hearing that he was twenty-four years old, literate and a student at Eastern Connecticut State University at the time of the accident. On that undisputed testimony, the court reasonably could conclude that the defendant's education and intelligence were not deficient. With respect to advisement of his rights, it is undisputed that the defendant was afforded the opportunity to review the standardized consent form prior to signing it. That form stated in relevant part that "I understand that this test is voluntary on my part and I am not obligated to take any such test." At the suppression hearing, Mahar testified that the defendant appeared to read the form prior

to signing it. Although the state is not required to demonstrate the subject's knowledge of a right to refuse consent; *State* v. *Jenkins*, supra, 298 Conn. 251; the court on that evidence reasonably could conclude that the defendant was cognizant of that right.

In addition, there is no evidence in the record indicating that the police either coerced or threatened the defendant in any manner. Following the preliminary investigatory detention that culminated with the administration of the field sobriety tests—which detention the defendant concedes was proper—the defendant moved freely about the accident scene without restraint or restriction by the police. At no time did the police handcuff the defendant, lock him in a cruiser or otherwise prevent him from leaving the scene. See *United States* v. *Watson*, 423 U.S. 411, 424–25, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976) (The court emphasized that consent was given on a public street, "not in the confines of the police station," and that "[t]here was no overt act or threat of force against [the defendant] proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment."); *State* v. *Jenkins*, supra, 298 Conn. 252 (defendant not threatened or restrained by police); *State* v. *Winot*, 95 Conn. App. 332, 349, 897 A.2d 115 (2006) (The court determined that the consent given by the defendant while he was under arrest and sitting in the back of a police cruiser was voluntary because the defendant "does not claim to have been threatened in any way by anyone at the scene. He has not alleged that improper promises were made to him or that he was subjected to any other more subtle forms of coercion that might improperly have impaired his judgment."), rev'd in part on other grounds, 294 Conn. 753, 988 A.2d 188 (2010). There also is no allegation or evidence that the police employed any form of physical punishment against the defendant.

This case is further distinguishable due to the fact that the defendant provided written consent to the blood test not once, but twice. Apart from his consent at the accident scene, the defendant later signed a second consent form at the hospital in the presence of his mother and French. That consent form was admitted into evidence at the suppression hearing. French testified at the suppression hearing that he did not coerce the defendant in any manner or promise him anything in exchange for his consent. French also testified that neither the defendant nor his mother asked any questions about the consent form or his consent to the blood sample generally. Last, although Mahar testified that the defendant was "crying hysterically" when he initially approached him at the accident scene, there is no evidence in the record that he remained upset when he later provided written consent at the accident scene and the hospital, nor did the court make a factual finding to that effect. To the contrary, Mahar in his testimony confirmed that while the defendant "was shaken up initially," he later regained his composure and was able to provide a coherent and rational explanation of what had just occurred.

On our careful review of the record, the totality of the circumstances persuades us that the state met its burden of proving, by a preponderance of the evidence, that the defendant freely and voluntarily consented to the blood test. The court's finding, therefore, is not clearly erroneous.

II

The defendant also claims that the blood test resulted from an unconstitutional seizure. He contends that the blood test ultimately administered at the hospital resulted from an illegal investigative detention at the accident scene. The state disagrees, insisting that the defendant was not detained at the accident scene. The

state alternatively argues that any detention of the defendant was supported by a reasonable and articulable suspicion of criminal activity.

A

"It is well settled that [i]f the police obtain physical evidence or statements as the result of the seizure of a person without probable cause . . . the fruit of the poisonous tree doctrine requires that the evidence be suppressed as the product of the unlawful seizure. . . . We have . . . defined a person as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Citations omitted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 404, 678 A.2d 1338 (1996).

Our Supreme Court has explained that "[a] person is not arrested or seized . . . if he freely chooses to enter into or continue an encounter with the police. . . . Police officers do not violate an individual's constitutional rights by approaching him, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions. . . . Among the factors that may be considered in determining whether a defendant's encounter with police was consensual in nature are: the time, place and purpose of the encounter . . . ." (Citations omitted; internal quotation marks omitted.) Id., 405.

As we already have noted, the defendant on appeal does not contest the validity of his initial detention at the accident scene or the administration of field sobriety tests. His sole claim is that the conduct of the police, particularly their failure to expressly inform him that he was free to leave after the field sobriety tests concluded, led him to believe that he was not free to leave. The facts adduced at the suppression hearing convince us otherwise.

First and foremost, we note that the alleged seizure did not occur in a police cruiser or headquarters. It occurred at the scene of a catastrophic accident in which a bystander was severely injured. The cumulative testimony of all witnesses at the suppression hearing plainly indicates that the accident scene was a chaotic one, as police worked to secure the scene, to provide care to injured persons, to conduct preliminary investigation and accident reconstruction, and to ensure the safety of everyone involved. Speaking with the defendant, the operator of the vehicle that struck Schaus, was but one aspect of their efforts. See, e.g., *State* v. *Foote*, 85 Conn. App. 356, 361, 857 A.2d 406 (2004) (distinguishing community caretaking functions of local police officers, such as assisting motorists, from "detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" [internal quotation marks omitted]), cert. denied, 273 Conn. 937, 875 A.2d 43, 44 (2005).

Second, there is no indication in the record before us of any affirmative act of the police that reasonably could be construed as restraint or restriction of the defendant. After Mahar completed the field sobriety tests, which the defendant passed, he walked away from the defendant, at which time the defendant moved freely about the accident scene. See *State* v. *Britton*, 283 Conn. 598, 612, 929 A.2d 312 (2007) (court deems it relevant that defendant "not handcuffed or subjected

to force"); *State* v. *Doyle*, 104 Conn. App. 4, 14, 931 A.2d 393 (court deems it relevant that defendant not physically restrained in any way), cert. denied, 284 Conn. 935, 935 A.2d 152 (2007). Indeed, the defendant walked over and chatted with his father, who had arrived at the scene. There further is no allegation by the defendant, or evidence in the record to suggest, that the police employed any form of physical punishment against the defendant or that they threatened him in any manner. In *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), the United States Supreme Court listed a number of factors that, "in view of all of the circumstances surrounding the incident," might indicate a sufficient show of authority to create a seizure. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. None of those factors are present here.

It is undisputed that the police never expressly informed the defendant that he was free to leave after the field sobriety tests concluded. Our law, however, imposes no such affirmative obligation on law enforcement personnel. Rather, whether a defendant is specifically apprised of the right to leave is but one consideration in the totality of the circumstances analysis into whether that defendant was seized. See *Ohio* v. *Robinette*, 519 U.S. 33, 39–40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (holding that it would "be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary"); *State* v. *Greenfield*, 228 Conn. 62, 71–72 n.10, 634 A.2d 879 (1993) ("[a]lthough the police made no such express statement in the present

case, the trial court could reasonably have found that . . . the defendant understood that their meeting was consensual, and therefore the defendant did not need to be expressly informed that he was free to leave"); cf. *United States* v. *Kimball*, 25 F.3d 1, 8 (1st Cir. 1994) (defendant voluntarily consented to accompany officers to police station because, even though he was not told that he was free to leave or free to refuse further questioning, he expressly agreed to go to station when asked several times, never indicated any unwillingness to do so, and officers did not handcuff, physically restrain, threaten to arrest, coerce or otherwise intimidate defendant). While there is no evidence that the police informed the defendant that he was free to leave, there likewise is no evidence that they indicated otherwise. There also is no evidence that the defendant ever inquired as to whether he was free to leave.

The evidence in the record indicates that, at the time of the alleged seizure, the defendant moved freely about the accident scene. The alleged seizure transpired on the heels of a significant motor vehicle accident that resulted in serious physical injury to Schaus, at which time the police worked to address a variety of issues, including securing the scene, providing medical attention, tending to public safety matters in the immediate vicinity of the accident, as well as a panoply of investigative functions. The record reveals no indicia of coercion or restraint of the defendant on the part of the police. In sum, the totality of the circumstances surrounding the police conduct at the time of the alleged seizure indicates that a reasonable person would not have believed that he was not free to leave following the completion of the field sobriety tests.

B

Even if we were to conclude that a reasonable person in the defendant's position would not have believed

that he was free to leave, the defendant still could not prevail. The state maintains that an investigative detention of the defendant at the scene of the accident was warranted under the totality of the circumstances then existing.

As our Supreme Court has explained, "[u]nder the fourth amendment to the United States [c]onstitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . [I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . [A] court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . .

"In addition, [e]ffective crime prevention and detection . . .. [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate

manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. . . . Therefore, [a]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity."[12] (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 297 Conn. 1, 9–10, 997 A.2d 461 (2010).

In the present case, the police encountered the defendant while responding to a catastrophic accident. The defendant concedes in this appeal that the preliminary investigatory detention that culminated with administration of the field sobriety tests was proper. He nevertheless claims that the detention improperly continued after he performed to standard on those tests. We disagree.

As we already have noted, the accident scene was a chaotic one in which one victim sustained severe injuries. Investigating the defendant, as the driver of the vehicle that struck Schaus, was but one of the myriad tasks police performed at the scene. Because the police had duties beyond investigation—guarding the public

---

[12] As the United States Supreme Court noted, "[c]ourts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States* v. *Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

safety and providing medical assistance to the injured, in particular—the officers at the scene "must be given some measure of reasonable discretion and flexibility to fulfill their duties." *State* v. *Burroughs*, 288 Conn. 836, 855, 955 A.2d 43 (2008).

In addition, there existed specific and articulable facts that reasonably suggested that the defendant had operated his vehicle under the influence of alcohol. Although the defendant performed the three field sobriety tests to "standard," the defendant failed to perform one portion of the walk and turn test properly. See footnote 4 of this opinion. Mahar considered that deficient performance to be a clue into whether the defendant was under the influence of alcohol. It further is undisputed that Mahar and Sevigny detected the odor of alcohol on the defendant's breath when they initially spoke with the defendant. Likewise, when the defendant's supervisor from work, Simon Wells, arrived at the accident scene, he, too, smelled alcohol on the defendant's breath and shared that observation with the police. Any suspicion that the defendant had operated his vehicle while under the influence of alcohol only increased when the defendant informed the police that he had consumed alcohol earlier that day. Last, it bears emphasis that this accident occurred as a direct result of the defendant's having driven his vehicle off the road and onto Schaus' property, striking and severely injuring him.

In taking into account "the whole picture" of what transpired at 42 North Windham Road on August 17, 2007; *United States* v. *Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); we also are mindful that "[t]he continuing death, devastation and misery inflicted by intoxicated drivers, and the ever increasing emotional and financial costs of their behavior, which society must bear, have been well documented. . . . This has led every community to share a unitary interest

in the swift apprehension and punishment of intoxicated drivers. This often depends, however, on the prompt, yet lawful, recovery of highly evanescent evidence stemming from sobriety and blood testing." (Citations omitted.) *State* v. *Stevens*, 26 Conn. App. 805, 817–18, 603 A.2d 1203 (1992), aff'd, 224 Conn. 730, 620 A.2d 789 (1993). In light of the obvious odor of alcohol on the defendant's breath, his deficient performance of a portion of the walk and turn sobriety test, his operation of his vehicle onto the victim's property and his admission that he had consumed alcohol earlier that day, the totality of the circumstances convince us that a reasonable and articulable suspicion existed that warranted detention of the defendant beyond the time that he completed the field sobriety tests. We, therefore, conclude that the court properly denied the defendant's motions to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

