******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DONTAY EAVON EARLY
(AC 36361)

Bear, Keller and Schaller, Js.*

*Argued May 2—officially released August 26, 2014*

(Appeal from Superior Court, judicial district of
Waterbury, Prescott, J.)

*Mary Beattie Schairer*, assigned counsel, for the

appellant (defendant).

*Robin S. Schwartz*, special deputy assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Cynthia S. Serafini*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Dontay Eavon Early, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a).[1] The defendant claims that the court improperly denied his motion to suppress evidence of an oral statement and a written statement that he provided to the police because such statements were obtained in violation of his constitutional rights. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found that in the years prior to the events at issue in this appeal, the defendant and the victim, Brian Greene, had a history of conflict, including physical altercations. On May 10, 2010, the defendant located the victim, who was sitting in a parked automobile in Waterbury. Armed with a gun, he approached the victim's automobile and shot the victim in the head through the driver's side window. The gunshot caused the victim's death. After the shooting, the defendant walked away from the scene. Barbara Nieves, who was familiar with the defendant prior to this event, observed the defendant's conduct and the victim's injuries, and summoned emergency personnel to the scene.

The state presented evidence related to incidents following the defendant's arrest on September 17, 2010, during which the defendant implicated himself as the sole perpetrator of the victim's murder. Specifically, the state presented evidence that the defendant was taken into police custody pursuant to an arrest warrant, and while he was being transported to police headquarters but prior to his being advised of his *Miranda* rights,[2] he stated that "he eventually was going to turn [himself] in" to the police in connection with the victim's murder. Additionally, the state presented evidence that, after the defendant arrived at police headquarters, he was advised of his *Miranda* rights, agreed to be questioned by the police, and provided the police with a detailed written statement in which he implicated himself as the shooter.

Prior to the start of trial, the defendant filed a written motion to suppress, inter alia, any confessions or inculpatory statements, whether written or oral in nature, allegedly made by him in connection with the present case. On January 3 and January 4, 2012, the court conducted a hearing related to the motion to suppress. The subject of the motion and the suppression hearing was a written statement provided to the police on May 10, 2010, as well as an oral statement and a written statement provided to the police on September 17, 2010. Although the court denied the motion to suppress in its entirety, the defendant, in the present appeal, challenges the denial only insofar as it pertained to the oral and written statements made by the defendant on

September 17, 2010. Consequently, we limit our review to that portion of the court's ruling.

At the hearing, the court heard testimony from George Tirado, a detective with the Waterbury Police Department; Michael Slavin, a lieutenant with the Waterbury Police Department;[3] Orlando Rivera, a detective with the Waterbury Police Department; Betty Cadore, a nurse employed by the New Haven Correctional Facility; and the defendant. Following the presentation of evidence, defense counsel argued that the oral statement allegedly made by the defendant on September 17, 2010, when he was being transported to the police department, should be suppressed because it was the result of a custodial interrogation by the police prior to when he was advised of his *Miranda* rights. At the suppression hearing, the defendant testified that his written confession of September 17, 2010, was the direct result of a coercive and violent interrogation process during which the police tased him and repeatedly struck him at the police department. Defense counsel argued that this testimony, as well as alleged inconsistencies in the testimony of the police witnesses at the suppression hearing, required a finding that the police conspired to obtain the defendant's inculpatory written statement by illegal means and a conclusion that it had been obtained in clear violation of the defendant's rights.

The court orally delivered its ruling denying the motion to suppress.[4] The court made findings related to a police interview of the defendant that occurred on May 10, 2010, at the Waterbury Police Department, related to the shooting death of the victim. The court found that the defendant voluntarily took part in this interview and that he had waived his *Miranda* rights. During the interview, the defendant denied any involvement in the crime. Initially, he told the police that he was in Naugatuck at the time of the shooting. After the police confronted the defendant with information that tended to disprove that version of events, the defendant admitted that he was in Waterbury at the time of the shooting, but he maintained that he was not involved in the shooting. At the conclusion of the interview, the defendant provided a written statement. At the suppression hearing, the defendant testified that his oral statements and written statements of May 10, 2010, were the result of a violent police interrogation. The court stated that it did not credit this testimony, finding that "the defendant was not threatened, assaulted or promised anything in exchange for agreeing to provide the statement."

Thereafter, the court made the following findings and conclusions of law that are relevant to the oral statement and written statement, both of September 17, 2010, that are issue in the present appeal: "On September 17, 2010, the state obtained a warrant to arrest the

defendant for the murder of [the victim]. That afternoon, Waterbury police detectives located the defendant at an address on Boyden Street in Waterbury and took the defendant into custody. The defendant was placed in an unmarked police vehicle and transported to the Waterbury Police Department. During the ride to the station, the defendant was not questioned by the detectives. However, in the car, the defendant voluntarily stated, without prompting, that he was planning on turning himself in.

"After arriving at the Waterbury Police Department, the defendant was escorted to booking on the first floor of the building to begin the booking process. Shortly thereafter, Sergeant Slavin was informed that the defendant had volunteered that he was going to turn himself in. Based on this information, [Sergeant] Slavin concluded that it might be fruitful to interview the defendant a second time. Accordingly, he asked that the defendant be brought up to the Detective Bureau, which is on the third floor of the building. The defendant was retrieved from booking, brought to the third floor, and placed in an interview room to be questioned.

"The Waterbury Police Department then used the same procedure they had used in conducting the May interview with the defendant. The defendant was advised of his constitutional *Miranda* rights, he orally acknowledged that he understood his rights and was willing to waive them. He signed the preprinted rights card and did not request the assistance of an attorney.

"The defendant then orally admitted to killing [the victim] and provided the detective[s] other details regarding the shooting and other events related to it. During this entire process, the defendant was not under the influence of alcohol or drugs. The defendant also agreed to provide a written statement acknowledging his involvement in the murder.

"The defendant was then re-advised of his rights, and he again agreed to waive them. He signed a written acknowledgement and waiver form before a detective began taking his statement into the computer. The defendant was asked a series of questions, and the detective typed his answers into the computer.

"At the end of this process the statement was printed and the defendant was given an opportunity to read it and make any changes to it he believed were appropriate. The defendant signed the statement and initialed it in several places. The defendant swore to the truth of the [statement].

"At the suppression hearing, the defendant testified that his oral and written statements on [September 17, 2010] were coerced from him through physical force committed by Detective Tirado and [Sergeant] Slavin. The defendant testified that he was tased by the detectives, kneed in the groin, and punched in the head. The

defendant testified that these assaults occurred, not in an interview room, but in the middle of the Waterbury Police Department detective bureau in front of numerous witnesses. The court, again, does not credit this testimony, which is uncorroborated by any reliable evidence.

"[The court] also [does] not credit his claim that the Waterbury Police Department failed to inform him of his *Miranda* rights before questioning him, either on May 10, 2010, or on September 17, 2010, or that he asked for a lawyer during any interrogation.

* * *

"With respect to the statements made on September 17, 2010, the state concedes that the defendant was in custody when he was arrested on a warrant that afternoon. The court concludes, however, that the oral statement the defendant made before he had been advised of his *Miranda* rights was not made in response to any questions asked by the Waterbury Police Department, but instead was spontaneously and freely made in the absence of any interrogation. . . .

"Based upon my review of the facts and circumstances, the sole comment which the defendant seems to rely upon in arguing that the police department's activities were intended, or could reasonably be construed to be intended, to elicit an incriminating response, is that one of the detectives said to the defendant that he previously told the defendant that [the police] were going to arrest him. The court does not believe that that [statement] is likely to lead to an incriminating response and, again, the court finds that the defendant volunteered the information in the cruiser or the police car that he had been planning on turning himself in.

"The court also concludes that all of the defendant's other oral and written statements made that day occurred after the defendant had been advised of his *Miranda* rights, and knowingly and voluntarily agreed to waive them. The court further finds that the interrogation by the Waterbury Police Department on that day was not coercive and his inculpatory statements were not made as the result of any assault, threats or unlawful coercion."

As he did at trial, the defendant claims that evidence that he gave an oral statement to the police while en route to the police department on September 17, 2010, should have been suppressed because it was the result of a custodial interrogation before the police advised him of his *Miranda* rights. With regard to his subsequent written statement of September 17, 2010, the defendant claims for the first time on appeal that the statement should have been suppressed under the doctrine set forth in *Missouri* v. *Seibert*, 542 U.S. 600, 613–14, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), which

provides that if the police initially obtain a confession in contravention of *Miranda* and later, following proper *Miranda* warnings, obtain the same confession, it is inadmissible under *Miranda*. Because we conclude in this opinion that the defendant's oral statement was not obtained in violation of his *Miranda* rights, we also conclude that the doctrine set forth in *Seibert* is inapplicable in the present case and, thus, reject his second claim related to the admissibility of his subsequent written statement.[5]

As it relates to the court's ruling to permit evidence of the defendant's oral statement, the defendant's claim is both factual and legal in nature. First, he argues that the court improperly found that, just prior to the time that the defendant uttered his oral statement, Tirado merely had stated to him "that he had previously told the defendant that [we] were going to arrest him." The defendant asserts that the court materially mischaracterized Tirado's testimony in this regard because Tirado actually stated to the defendant, "I told you we would continue to work on this." Second, the defendant argues that "Tirado's comment to [him], by its words, tone, manner, and context, was reasonably likely to elicit a response from an arrestee, as it did here." The defendant argues that the evidence demonstrates that, *after* the defendant asked the reason for his arrest and Tirado answered this question, Tirado, merely by uttering the phrase "I told you we would continue to work on this," purposefully engaged in conversation "that was objectively intimidating to someone in [his] position. [Tirado] called up their shared history of a lengthy interrogation on May 10. [Tirado] directly confronted him with that history and all of its 'baggage,' stating, 'I told you we would continue to work on this,' i.e., continue to build a case against you." For all of these reasons, the defendant argues, he was subjected to an interrogation, while in police custody, prior to being provided with notice of his *Miranda* rights.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Thompson*, 307 Conn. 567, 574–75, 57 A.3d 323 (2012).

As a preliminary matter, our review of the evidence presented at the suppression hearing leads us to conclude that the court's findings of fact with regard to Tirado's statements to the defendant were fully supported by the evidence. As set forth previously in this opinion, the court found that while the defendant was

being transported to the police department on September 17, 2010, the police did not question the defendant in any manner. The court found that "one of the detectives said to the defendant that he had previously told the defendant that they were going to arrest him." The court aptly characterized this statement as the linchpin of the defendant's argument that an interrogation had occurred en route to the police department. The court, consistent with the testimony of the police officers, did not find that any additional conversation between the police and the defendant took place at that time. The defendant does not argue otherwise.

Turning to the evidence presented at the suppression hearing, Tirado testified that the defendant was placed in police custody and was then transported to the Waterbury Police Department. Tirado testified: "On the way he—[the defendant] asked what's this for, and I explained to him that he was getting arrested for the murder. He kind of put his head down and didn't say anything. I kind of made a statement that *I told you we were going to work on it*, and he shook his head yes, and made the statement that I was eventually going to turn myself in." (Emphasis added.) The prosecutor asked Tirado to restate what had occurred, and Tirado testified: "On the way in [the defendant] asked what was this for? I explained to him that it was for the murder of [the victim]. He kind of shook his head, didn't say anything for a minute. I made the statement that *I told you we were going to continue to work on this*, and he responded by saying, I eventually was going to turn myself in." (Emphasis added.) Later, during his cross-examination by defense counsel, Tirado testified that "I made a statement saying that *I told you we were going to continue*." (Emphasis added.) Tirado testified that the defendant stated, "I eventually was going to turn myself in." Tirado stated that he was surprised by the defendant's statement, and that he did not ask him any follow-up questions until he was interviewed at the police department.

At the hearing, Rivera testified that he was present in the police cruiser when the defendant was being transported to the police department. The following colloquy between the prosecutor and Rivera took place:

"Q. When you were in the car transporting [the defendant] to the Waterbury Police Department, did he say anything? . . .

"A. He said that he was going to turn himself in.

"Q. And was that in response to anybody saying anything to him?

"A. No, he just said it. . . .

"Q. Okay. So once [the defendant] said that, did anybody respond to that?

"A. Not that I remember."

At the suppression hearing, the defendant testified that, at the time he was taken into police custody on September 17, 2010, Slavin informed him that he was being taken into custody for violating a protective order. The defendant testified that while he was being transported to the police department, Tirado stated, "I told you I would . . . catch you or something like that." The defendant testified that he did not reply to Tirado's comment.

The defendant's challenge to the court's factual finding is narrow; he urges us to conclude that the court's findings were clearly erroneous because the court did not expressly find that Tirado prefaced his statement to the defendant with the words "I told you." Instead, the court stated that Tirado "said to the defendant that he previously told the defendant that they were going to arrest him."

Our review of the court's findings as set forth in its oral decision reflects that the court did not purport to recite the exact words that Tirado used when addressing the defendant, but that it set forth what it found to be the substance of those words. This is understandable because, as the foregoing discussion of the evidence presented at the suppression hearing reflects, each time that Tirado testified as to what he said to the defendant, his testimony, while materially the same, differed somewhat with regard to the specific words he uttered. Tirado testified consistently that he prefaced his statement with the words, "I told you," yet he used the phrases "going to continue to work," "going to work," and "going to continue." The court, perhaps influenced by the defendant's testimony at the suppression hearing, found that Tirado stated "that he had previously told the defendant they were going to arrest him."

It is readily apparent from a review of the court's decision that it accepted as true the testimony of Tirado and Rivera, and its findings were in harmony with that testimony. Although the defendant focuses exclusively on the court's failure to find that Tirado prefaced his statement with the specific words "I told you," the court, in substance, made such a finding when it stated that Tirado said to the defendant "that *he had previously told the defendant* that they were going to arrest him." (Emphasis added.) Furthermore, the court's finding that Tirado also stated that "they were going to arrest him" finds support in the evidence and the reasonable inferences that the court could have drawn from it.

Moreover, in considering the merits of the constitutional claim presented on appeal, it is appropriate that we consider not only the entire substance of the testimony on which the court relied, but the record in its entirety. This includes Tirado's trial testimony, which

was consistent with the testimony he provided at the suppression hearing.[6] On appeal, "[w]e review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress." (Internal quotation marks omitted.) *State* v. *Edwards*, 299 Conn. 419, 439 n.16, 11 A.3d 116 (2012). We are mindful that, "[w]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Doyle*, 139 Conn. App. 367, 374, 55 A.3d 805 (2012), cert. denied, 307 Conn. 952, 58 A.3d 976 (2013).

Having addressed the factual aspect of the claim, we turn to the legal propriety of the court's analysis. "The following principles concerning the requirement of *Miranda* warnings govern our analysis of the defendant's claim. Although [a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it . . . only an interrogation that occurs when a suspect is in custody heightens the risk that statements obtained therefrom are not the product of the suspect's free choice. . . . This is so because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements . . . . Thus, the court in *Miranda* was concerned with protecting defendants against interrogations that take place in a police-dominated atmosphere, containing inherently compelling pressures [that] work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely . . . . By adequately and effectively appris[ing] [a suspect] of his rights and reassuring the suspect that the exercise of those rights must be fully honored, the *Miranda* warnings combat [the] pressures inherent in custodial interrogations. . . . In so doing, they enhance the trustworthiness of any statements that may be elicited during an interrogation. . . . Consequently, police officers are not required to administer *Miranda* warnings to everyone whom they question . . . rather, they must provide such warnings only to persons who are subject to custodial interrogation. . . . To establish entitlement to *Miranda* warnings, therefore, the defendant must satisfy two conditions, namely, that (1) he was in custody when the statements were made, and (2) the statements were obtained in response to police questioning." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Mangual*, 311 Conn. 182, 191–92, 85 A.3d 627 (2014). "When the police interrogate a custodial suspect without first providing that suspect with the warnings required by *Miranda*, there is a presumption that any ensuing statements made by the suspect resulting from the unwarned

interrogation were compelled and must be suppressed." *State* v. *Gonzalez*, 302 Conn. 287, 300, 25 A.3d 648 (2011).

Here, the evidence plainly reflects, and the state agrees, that the defendant was in police custody at the time that he uttered the statement at issue. Nor is it in dispute that the defendant was not advised of his *Miranda* rights until after he arrived at the police department. The issue, therefore, is whether the statement he gave to the police en route to the police department was the product of police interrogation.

"In *Rhode Island* v. *Innis*, 446 U.S. 291, 300–302,100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the United States Supreme Court concluded that, the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. *A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.* But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. . . .

"A number of courts have held that, if the police confront a suspect with incriminating evidence against him for the purpose of eliciting an incriminating response, the conduct constitutes an interrogation under *Miranda* and *Innis*. A number of courts also have held that, if the police inform a suspect of the evidence against him as an ordinary incident of arrest and custody, the conduct does not constitute interrogation. Several courts have expressed doubts as to whether the latter rule is consistent with *Innis*. We are persuaded, however, that a per se rule that confronting a suspect with incriminating evidence constitutes interrogation is not required under *Innis*. Rather, whether such conduct constituted an interrogation depends on whether it was a normal incident of arrest and custody or, instead, was intended to elicit an incriminating response. . . . This is a fact-bound determination that

must be made on a case-by-case basis. . . .

"The United States Supreme Court has not defined what type of conduct is considered to be normally attendant to arrest and custody . . . . The Ninth Circuit Court of Appeals has concluded, however, that when, at the time of arrest, an officer responds to an arrestee's confusion or curiosity by informing him of circumstances which contribute to an intelligent exercise of his judgment, this information may be considered normally attendant to arrest and custody. . . . In contrast, to constitute a custodial interrogation under *Miranda*, police conduct must work to undermine the individual's will to resist and to compel him to speak . . . . Accordingly, we conclude that factors to be considered in determining whether confronting a defendant with incriminating evidence was conduct normally attendant to arrest and custody . . . or, instead, constituted a custodial interrogation, include: the timing of the conduct, i.e., whether it was done at or near the time of arrest; whether the police reasonably could have believed that the defendant desired information regarding the reasons for his arrest in order to make intelligent decisions about such matters as whether to waive his fifth amendment right, whether to request the services of an attorney and whether to advise his family and associates of his arrest; whether the police conduct was, in fact, meaningfully responsive to the defendant's desire for information; and whether there is any evidence that the police intended to compel the defendant to speak. We emphasize that, if the circumstances would tend to support a finding that the police conduct was of a type normally attendant to arrest and custody, the court's focus should be on whether the primary *purpose* of the police officer in confronting the defendant with the incriminating evidence was to elicit an incriminating response instead of whether the conduct was reasonably likely to elicit an incriminating response. *Innis* expressly recognized that words and actions normally attendant to arrest and custody may be reasonably likely to elicit an incriminating response without constituting an interrogation. . . . We further note that none of these factors is dispositive and the weight to be given to each depends on the particular facts and circumstances of each case." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 525–28, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

In the present case, the evidence reflects, and the court found, that the defendant's inculpatory statement to the police was not made in response to any police questions, but appears to have been a spontaneous statement voluntarily made by him after he had considered the circumstances of his arrest. The defendant suggests that Tirado's statement to him, that "I told you we would continue to work on this," was provocative

and was reasonably likely to elicit a response. He also argues that there was a meaningful delay between this compelling statement and Tirado's earlier statement that the arrest was related to the victim's murder. Both of Tirado's statements were made shortly after the defendant was taken into police custody, and they reasonably could be viewed as having been made in response to the defendant's inquiry concerning the reason for his arrest. Plainly, the defendant requested information from the police. Tirado's statements were meaningfully responsive to the defendant's inquiry, for they informed him that he was arrested for the victim's murder and that the arrest was related to Tirado's earlier investigation of it. Although it is not dispositive that the defendant was not subjected to explicit questioning, we do not view the general information provided by Tirado as being calculated to provoke a response.

Furthermore, unlike the defendant, we do not necessarily reasonably interpret the fact that Tirado prefaced his statement with the phrase "I told you" as being designed to provoke a response. The statements made by Tirado were of the type that would have been useful to the defendant in terms of making intelligent decisions about matters related to his arrest. Although the evidence and findings reflect that there was a brief delay between Tirado's statements to the defendant, we disagree with the defendant that the delay was so significant as to compel the conclusion that Tirado's second statement should be viewed as nonresponsive to the defendant's inquiry or that the second statement, in contrast to the first, in any way compelled the defendant's incriminatory response.

Thus, the circumstances, as found by the court and reflected in the evidence, support a finding that Tirado's conduct was attendant to the defendant's arrest and custody. Tirado did not ask any questions of the defendant and, following the defendant's inculpatory statement, he, like the other police officers in the police automobile, did not respond in any manner. Certainly, one may presume that if Tirado had intended to elicit incriminating statements from the defendant, he would have reacted to the defendant's statement with inquiries designed to more fully implicate him in the crime. "The test as to whether a particular question is likely to elicit an incriminating response is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime committed is highly relevant." (Internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 590, 916 A.2d 767 (2007). Here, the evidence reflects that Tirado and the other police officers were surprised by the defendant's statement and appropriately did not conduct any inquiry until after the defendant was apprised of his *Miranda* rights. Viewed in its entirety, the evidence supports a conclusion that the police did not compel the defendant to speak. Accordingly, we

conclude that the defendant's statement was not the product of a custodial interrogation by the police. The court properly denied the motion to suppress.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant was sentenced to a term of incarceration of sixty years, twenty-five years of which was a mandatory minimum sentence.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The evidence reflects that at times relevant in 2010, Slavin was a Sergeant with the Waterbury Police Department.

[4] Subsequently, the court filed a signed transcript of its decision in accordance with Practice Book § 64-1 (a).

[5] As noted earlier in this opinion, at the suppression hearing, the defendant testified that his written confession of September 17, 2010, was the direct result of a coercive and violent interrogation process during which the police tased him and repeatedly struck him at the police department. Although the defendant sought to suppress the written statement on the basis of this testimony, the court expressly found that the defendant was not credible and, accordingly, did not rely on his testimony. On appeal, the defendant does not appeal from the court's ruling that he failed to prove that his written statement was the product of a violent interrogation; he acknowledges that the ruling was based on a credibility determination. Beyond observing that there was ample evidence in support of the court's findings of fact, we have considered and addressed the claim raised on appeal, as it pertains to the written statement of September 17, 2010, solely in terms of the manner that it has been presented to us, specifically, as a violation of the defendant's rights under *Seibert*.

[6] At trial, Tirado testified in relevant part as follows: "Basically once we were in the car and headed back [to the Waterbury Police Department], [the defendant] asked—he goes what's this for, and I explained to him it was for murder, he had a warrant for murder for [the victim], and he made a face, shook his head, and I made the statement that *I told you we weren't going to stop looking into this*, and he was quiet for a few seconds, and then he made the comment, I eventually was going to turn myself in." (Emphasis added.) Tirado testified that neither he nor the other police officers who were transporting the defendant made any comment in response to the defendant's statement, and that he was later interviewed at the police department.

[7] Because we uphold the court's denial of the motion to suppress the evidence of the defendant's oral and written confessions of September 17, 2010, we likewise reject his arguments that "the illegally obtained confessions impelled [him] to testify at trial" and that "[t]he admission of [his] statements into evidence was harmful error."